Filed 1/23/15  P. v. Cerda CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B232572 consolidated w/B235674 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. MA041397) |
| PETER JUAN CERDA et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Hayden Zacky, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant Peter Juan Cerda.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant Kyle Allin Johnson.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Louis W. Karlin and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants, Peter Juan Cerda and Kyle Allin Johnson, appeal their convictions for first degree murder (Cerda only), second degree murder (Johnson only), and 23 counts of premeditated attempted murder, with gang and firearm use enhancements (Pen. Code, §§ 187, 664, 187, 186.22, 12022.53).[1] Cerda was sentenced to state prison for a term of 816 years to life. Johnson was sentenced to state prison for a term of 410 years to life.

The judgments are affirmed in part, reversed in part, and remanded with directions.

## BACKGROUND

Although Cerda and Johnson were tried jointly, they had separate juries. Their appeals have been consolidated. Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence*.

    a. *The Katrina Place shooting (counts 1-14).*

On the night of February 10, 2008, a large group of people were attending a party at a house on Katrina Place in Palmdale. Various witnesses, who either resided at the house or had come for the party, testified they heard gunshots and the sound of bullets passing through the house.

Ricardo R., who was in the garage at the time, heard gunshots. One shot was fired into the garage, making a hole in a television set. Ricardo went into the house and rushed upstairs to check on his daughter, who was sleeping in the master bedroom with another child. He found two bullet holes in the bathroom of the master bedroom, about three feet away from where the children had been sleeping.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

Adrianna R. had come to the party with her friend Gerardo Salazar, a 24-year-old taxi driver. They were sitting in the house at the dining room table with several other people when the shooting erupted. There were gunshots "all over the house" and Adrianna could hear things ricocheting off the walls. When the shooting stopped, Salazar was bleeding and lying face down on the floor. He died from a gunshot wound to the back of the head.

At the time of the shooting, Daniel D., Christina E. and Luze E. were on the second floor of the house. Luze was sleeping in one bedroom and there were two young children sleeping in a second bedroom. Luze testified she was awakened by the sound of 20 gunshots. Daniel and Christina were in a third bedroom, which was located across the stairs from the master bedroom and directly above the dining room. Daniel heard 13 or 14 gunshots. Looking out the window, he saw a large pickup truck in the street and the muzzle flashes of a gun being fired from the truck.

That same night, Erika V. and her sister had been attending a party at Jorge L.'s house, about two blocks from the Katrina Place house. At this party, Erika was introduced to a man called Casper, who was later identified as defendant Johnson. Jose Casillas, who had also been attending this party, later gave Erika and her sister a ride home in his dark green pickup truck. During the ride, Erika saw Johnson staggering down the street: "He was like grabbing onto himself. He looked like he was drunk, because he . . . couldn't walk well."

b. *The Morning Circle shooting (counts 15-24).*

Vicente Valle lived with 12 family members in a two-story house on Morning Circle, a little over a mile from the Katrina Place house. About 30 minutes after the shooting at Katrina Place, gunshots awoke Valle and his family. Valle went outside to investigate. There were six bullet holes in the exterior of his house. One bullet had penetrated the wall of his master bedroom. Valle's son, Vince, who was associated with the Val Verde Park gang, had been sleeping downstairs at the time of the shooting.

3

c. *Police statements of Pedro A.*

Pedro A. talked to the police about the events of that night and the juries heard a recording of his interview. Pedro also spoke to Detective Donna Cheeks at the time of trial about what he had witnessed, and Cheeks described this conversation for the juries.

Pedro told Cheeks he went with Sal Trujillo, defendant Johnson and defendant Cerda to the party at Jorge's house. At one point Cerda and Trujillo, who had left Jorge's to visit another party nearby, returned and told Pedro that Johnson "had been beaten up by some 18th Streeters at the other party." When Johnson came back to Jorge's a few minutes later, Pedro "could see that his lip was bloody, and he appeared upset." Pedro told Cheeks that plans were made "to retaliate against the people that had beat up" Johnson. Cerda retrieved an AK-47, which Pedro described as "a long, rifle-type weapon, black with a wooden stock, and a long banana clip." Cerda, Johnson and Trujillo got into Casillas's dark green F-150 Ford truck and Casillas drove off. Pedro did not go with them. Several minutes later, he heard gunshots.

A few days later, Johnson told Pedro what happened: "They had all gone in the truck. They had driven back to the party house location, driven around the block once, came back. [¶] . . . At one point, [Johnson] had gotten into the bed of the truck and was lying down holding the gun. And when they stopped in front of the party house, [Johnson] sat up and fired into the house."

In his earlier police interview, Pedro had said the following. During the party at Jorge's house, he learned Cerda, Johnson and Trujillo had left to visit a "[p]arty down the street at Katrina [Place]." When Cerda and Trujillo returned "they were all talking shit and being loud and [said] . . . 'homey just got jumped by the . . . 18th. . . you know' cause that was an 18th party and shit." A few minutes later, Johnson arrived: "He's all mad . . . with a big ass swollen lip and shit, 'I just got jumped by the 18 . . . .' " Johnson "was mad [and] heated." The group left "Jorge's to go to Marcos' house and from there we're all just . . . chillin' you know? And . . . someone comes up with the idea let's go shoot at that fucker you know." Asked who came up with this idea, Pedro said: "I think (unintelligible) like don't trip we're gonna get them fools, you know (unintelligible) a

4

gun and some other foolio and [Johnson's] like, 'Tonight. Fuck that.' So they went tonight . . . ."

Cerda and Casillas left Marco's to retrieve an AK-47 assault rifle from Cerda's house. This rifle belonged to Cerda. "From there they come back [to Marcos's house]. They show off . . . the gun . . . for like 20 minutes, 30 minutes. Wait for like an hour to smoke." The group then left in Casillas's truck, with Casillas driving, Cerda in the front passenger seat, and Johnson and Trujillo in the back seat. Two days later, Johnson told Pedro "they had to go around the block," and Johnson lay down in the back of the truck with the gun, and did the shooting from there. After Johnson shot up the Katrina Place house, the group drove to a house belonging to "some fool from VVP." They shot up the second house because "they're beefing and shit."

d. *Forensic evidence.*

Robert Keil, a senior criminalist and firearms examiner with the Los Angeles County Sheriff's Department, examined the Katrina Place shooting scene.

One bullet had gone through the garage door, pierced a wall and a television set, and then embedded itself in the back wall of the garage. Keil found numerous bullet holes in the front of the house. One bullet had gone through the dining room window and a wall, and ended up inside the kitchen refrigerator. Another bullet, which also had gone through the dining room window, was the bullet that killed Gerardo Salazar. Three bullets were found in the foundation area of the south exterior wall, underneath the dining room window. Three other bullets had gone through a stucco wall next to the dining room window and hit the north wall of the dining room. Another bullet had gone through the same wall, travelled through a hallway, and hit the wall on the opposite side of a stairway. One bullet had gone through the frame of the front door and then hit a wooden cabinet in the kitchen.

On the second floor of the Katrina Place house, Keil found a bullet hole in one of the roof tiles. This bullet had first gone through the wall of the second bedroom and then through a pair of sliding closet doors. There was evidence another bullet had hit the wall of the second bedroom. There were two bullet holes just to the left of the window in the second bedroom; these bullets had struck the north wall of the bedroom, one of them traveling across the hallway and through the staircase wall. Keil recovered a bullet fragment from the master bathroom sink.

In the street just south of the Katrina Place house, Keil found 16 spent cartridge cases. These came from .762 by .39-millimeter bullets, which is the ammunition fired by an AK-47 semi-automatic assault rifle. There were 16 bullet holes in the exterior of the house; bullets had struck both the first and the second story of the house. There were 10 bullet fragments inside the house consistent with the spent cartridges found in the street. A bullet recovered from the corner of the dining room had blood, tissue and bone residue on it, indicating it was the bullet that had killed Salazar. Keil prepared a diagram showing where each of the 16 gunshots had struck the exterior of the house and where some of those gunshots had traveled after penetrating the house.

Police recovered four live cartridges and four spent cartridge cases from the Morning Circle shooting scene. Keil concluded these spent cartridge cases matched the cartridge cases recovered from Katrina Place. Keil opined both sets of casings had been fired from the same AK-47 rifle.

The bullets used in an AK-47 military assault rifle are lighter than those fired from handguns, but they travel up to four times faster than a handgun bullet. Because "they are traveling at a much higher velocity" they "have the potential for penetrating a greater thickness, greater, more substantial barriers, such as exterior walls of residences, car doors, more substantial objects." Keil testified that, whereas a standard nine-millimeter round might not even penetrate the exterior stucco wall of a house, an AK-47 round is "a very high-velocity bullet" capable of penetrating "not only an exterior wall, but multiple walls, regardless of whether they strike any supporting members, such as two by four's or

6

anything else in the exterior wall. They have the potential to reliably perforate . . . exterior walls, based on my experience."

e. *Cerda's jailhouse phone calls*.

Two telephone calls Cerda made while in jail had been tape recorded. In the first call, he spoke to his parents. When his mother remarked, "They said they were gonna let you go today," Cerda said, "No, no, no. I'm not mom. I'm gonna be in here for a long time." Then to his father, Cerda said: "Listen to me they're not gonna release me." "I'm gonna be in here because I was involved in a murder. My friend shot someone and killed 'em. And I shot at a house but I didn't kill nobody, but my friend shot and killed someone. I shot a house but I didn't kill nobody."

In the second call, Cerda initially spoke to the father of a girl named Vanessa and said he was in jail because he was "involved with . . . a murder." Cerda then spoke to Vanessa and told her: "Yeah, I was involved with a murder, and . . . they got me for it."

f. *Johnson's police interview.*

Johnson was interviewed by Detectives Cooper and Robison. He initially denied any involvement in the shootings. But when Cooper said, "Ok how come your homeboys are lying on you then?," Johnson blurted out, "Oh my fucking God!" Asked if he had intended "to kill somebody or to scare somebody or what?", Johnson said, "My point was to go back with (unintelligible) people and just have a fight, be a big real fight. They wanted more than that. [¶] [Cooper]: So how'd it get out of hand? [¶] [Johnson]: I don't know. They just said, 'We're going to bust a mission.' And I said I'm not going."

Johnson subsequently admitted he went along on the mission, but he claimed Cerda had done all the shooting. "[Cerda] goes and gets the gun and tells me . . . you wanna go? I'm already getting in the hood, might as well go. I get in the car. [Cerda] gets in the bed of [the] truck and we pull up to the house and he does it. And then we drive up to another house that I don't even know whose house it was and he shot at that one too."

7

"[Robinson]:  All right . . . the motivation to go over there was that . . . they dissed you at that party.

"[Cooper]:  You wanted revenge 'cause they kicked your ass.  Yes?

"[Johnson]:  To get also revenge, but . . . [Cerda] is the one that wanted to shoot it. I didn't even want to shoot it but they told me to."

When Johnson was asked, "So . . . you guys come up with the idea to go shoot the house up, for . . . revenge, right?", he replied, "Yes sir."

After further questioning, Johnson admitted he did fire the rifle:  "I was drunk I didn't know what the fuck I was doing.  I didn't mean to hurt nobody."  Asked, "The truth is you fired on the 18th Street house and [Cerda] fired on the Val Verde house is that correct?", Johnson replied, "Yes."  Johnson said they "[d]rove down the street.  And they told me, when we stop, just start shooting."  "They said . . . I'm getting into the gang now I'm gonna have to do it."  Johnson said he was lying down in the truck bed, but then he sat up and started shooting at the Katrina Place house.  After doing the shooting, he "got back in the back seat and [Cerda] got in the back [i.e., in the truck bed].  And then we took [Cerda] to the [Val Verde Park] house."

g. *Gang "roll call"*

In December 2007, a probation officer searched the room of a female juvenile thought to be affiliated with the LMS gang.  The officer found a piece of paper he described as a gang roll call.  The paper had "LMS" written at the top, followed by a series of names, monikers and telephone numbers in a peculiar script resembling graffiti. There was an entry for Johnson, and there were references to Trujillo and Casillas, but there was no mention of Cerda.

h. *Gang expert testimony.*

Los Angeles County Sheriff's Deputy Robert Gillis testified as a gang expert. LMS or Locos Marijuanos is a street gang with more than 50 documented members. Gillis had personally dealt with a group of about 10 LMS members in the Palmdale area. When Gillis first came into contact with this gang "they were big into graffiti tagging," but over time their activities came to include vehicle thefts, possession of firearms, and

8

shootings. Based on his review of reported police contacts, field information cards, and so-called "hard cards," Gillis opined that Johnson, Cerda and Casillas had been members of the LMS gang at the time of the shootings.

Gillis was familiar with a gang called Val Verde Park or VVP. Vincent Valle Senior was an original founder of the gang and his son, Vincent Junior, was a member. At the time of the shootings, VVP and LMS were rivals. LMS was allied with a gang called Lancas, some of whose members had shot at VVP gang members around the corner from Vincent Valle's house. Gillis also testified 18th Street was "one of the largest Hispanic gangs in southern California." He was not aware of any rivalry between 18th Street and LMS.

Gillis explained the importance of "respect" to gang members and how they gain more respect by committing violent crimes. Losing a fight to a rival gang member would call for a violent response in order to regain respect and street credibility, both personal respect for the particular gang member involved in the fight and respect for the gang as a whole. A common response would be an organized act of retaliation. Presented with a hypothetical question based on the evidence presented, Gillis opined the two shootings had been committed for the benefit of a criminal street gang. "They leave and they go arm themselves with a gun. The . . . sole purpose for an AK-47 or assault rifle is to kill. And they go get that weapon. They come back to the location after they just had this . . . fight and they light up this house with a weapon with ammunition that is capable of going through . . . multiple houses." "[T]hey then leave and go to a secondary location – its rivals, as you said . . . they take the opportunity while they are out on their mission – which is a common thing gang members do is they go on missions – and they effect a second assault on another residence . . . ."

2. *Defense evidence.*

Johnson testified on his own behalf. He had been 16 years old at the time of the shootings. He arrived at Jorge's party after having used methamphetamine. While there, he drank 10 to 15 beers and smoked marijuana. After an hour, he walked over to the Katrina Place party where he had more beer. As Johnson was leaving Katrina Place he got into a fight. A "gang of people" surrounded him and he "saw punches coming from all directions." He was hit several times and knocked to the ground. He fled the party by jumping over a back wall. After that he walked home and stayed there the rest of the night. He did not return to the house where the fight occurred, and he did not tell Pedro he had been involved in the shootings.

During his police interview, Johnson initially told the truth by denying any involvement in the shootings, but then said he had been present because he was scared and wanted to go home. He was confused and kept giving the police different stories. He ultimately admitted having shot at the Katrina Place house because that's what the police wanted to hear.

On cross-examination, Johnson acknowledged he "hit up" other gang members at the Katrina Place party by asking them "where are you from?", as a result of which they punched him. But he lied to the police when he said he had gone along with Cerda to do the drive-by shooting. Although Johnson had told police he only drank two to four beers at Jorge's house and he "wasn't like really drunk where [you] don't know what happened," he testified this was untrue. He could not explain, however, why he would have lied to the police about how much he drank that night.

Johnson testified he was a member of LMS in 2008. He had known Cerda for about a year before the shootings; Cerda was not an LMS member.

Cerda did not testify.

3. *Rebuttal evidence.*

Both juries heard the recorded police interviews with Johnson that had initially been played only for his jury.

## CONTENTIONS

1. There was insufficient evidence to support defendants' convictions for premeditated attempted murder.

2. Cerda's convictions must be overturned because the trial court gave an erroneous instruction on the natural and probable consequences doctrine.

3. Defendants' convictions must be overturned because the trial court used a superseded version of CALCRIM No. 400.

4. The trial court erred by failing to instruct the two juries they could convict the defendants of shooting at an occupied dwelling house (§ 246).

5. The trial court improperly instructed the two juries on the so-called "kill zone" theory.

6. Johnson's attorney was ineffective for failing to ask for a jury instruction on a voluntary intoxication defense.

7. Cerda's trial attorney was ineffective for failing to object to inadmissible portions of the gang expert's testimony.

8. Johnson's convictions must be reversed for cumulative error.

9. Cerda's sentencing was improper.

10. The trial court erred by not ordering Cerda's probation report until after sentencing.

11. Johnson's sentence constituted cruel and unusual punishment under the Eighth Amendment.

**DISCUSSION**

1. *There was sufficient evidence to sustain defendants' convictions for premeditated attempted murder.*

Defendants contend there was insufficient evidence to sustain their premeditated attempted murder convictions arising out of the Katrina Place and Morning Circle shootings. This claim is meritless.

a. *Legal principles.*

(1) *Standard of review.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

Cerda asserts "[t]he fact that the jury convicted [him] is of no consequence to the appellate review of the sufficiency of the evidence." Not so. "Perhaps the most

fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error. [Citation.] Thus, when a criminal defendant claims on appeal that his conviction was based on insufficient evidence of one or more of the elements of the crime of which he was convicted, we *must* begin with the presumption that the evidence of those elements *was* sufficient, and the defendant bears the burden of convincing us otherwise. To meet that burden, it is not enough for the defendant to simply contend, 'without a statement or analysis of the evidence, . . . that the evidence is insufficient to support the judgment[ ] of conviction.' [Citation.] Rather, he must *affirmatively demonstrate* that the evidence is insufficient." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

(2) *Elements of aiding and abetting, and premeditated*
*attempted murder.*

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)

" 'The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice – a conscious disregard for life – suffices. [Citation.]' [Citation.] In contrast, '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 739.)

"[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.] 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. . . .' " (*People v. Smith, supra,* 37 Cal.4th at p. 741.) "An inference of intent to kill drawn on evidence of a

purposeful shooting with lethal force under all the attendant circumstances can support a conviction of attempted murder even without evidence of motive. [¶] . . . [T]he act of *purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice.* That the shooter had no particular motive for shooting the victim is not dispositive, although . . . where motive is shown, such evidence will usually be probative of proof of intent to kill. Nor is the circumstance that the bullet misses its mark or fails to prove lethal dispositive – the very act of firing a weapon ' "in a manner that could have inflicted a mortal wound had the bullet been on target" ' is sufficient to support an inference of intent to kill." (*Id.* at p. 742, italics added.)

Section 664 provides: "Every person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration, shall be punished where no provision is made by law for the punishment of those attempts, as follows: [¶] (a) If the crime attempted is . . . . willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole."

b. *Discussion.*

Defendants argue the evidence only showed their intent to shoot at two houses in violation of section 246 (shooting at an inhabited dwelling house), not an intent to kill the occupants of those houses. Not so. The evidence showed Johnson and Cerda intended to kill the people who were inside the two houses. The evidence also showed each defendant was guilty of attempted murder as an aider and abettor for the shootings carried out by the other defendant under the natural and probable consequences doctrine.[2]

---

[2]    Defendants argue certain favorable inferences should have flowed from various inconsistent aspects of the jury verdicts. These arguments are meritless. (See *People v. Superior Court (Sparks)* (2010) 48 Cal.4th 1, 13 [" 'If substantial evidence supports a jury verdict as to one defendant, that verdict may stand despite an apparently inconsistent verdict as to another defendant.' "]; *People v. Santamaria* (1994) 8 Cal.4th 903, 911 ["It is . . . settled that an inherently inconsistent verdict is allowed to stand; if an acquittal of

14

(1) *Express intent to kill as to all attempted murder counts.*

*People v. Anderson* (1968) 70 Cal.2d 15, 26-27, a murder case, discussed the following types of premeditation and deliberation evidence[3]: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing – what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [Citation.]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)."

_____

one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both."].)

[3]      "We do not distinguish between attempted murder and completed first degree murder for purposes of determining whether there is sufficient evidence of premeditation and deliberation. [Citation.]" (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1462, fn. 8, disapproved on other grounds in *People v. Mesa* (2012) 54 Cal.4th 191, 199.)

In this case, there was evidence of all three *Anderson* factors: motive, planning and manner of attempted killing. The evidence showed defendants planned and carried out two purposeful drive-by shootings with sufficient lethal force to have shot dead each attempted murder victim.

The evidence showed motives for both shootings. The defendants planned the attack on Katrina Place in retaliation for the assault on Johnson, and they then attacked the Morning Circle house because rival gang members lived there. As Johnson acknowledges on appeal, he "and his companions were motivated by considerations related to advancing their gang interests – fear, intimidation and respect."

There was planning evidence. (See, e.g., *People v. Miranda* (1987) 44 Cal.3d 57, 87, disapproved on other grounds by *People v. Marshall* (1990) 50 Cal.3d 907 ["that defendant brought his loaded gun into the store and shortly thereafter used it to kill an unarmed victim reasonably suggests that defendant considered the possibility of murder in advance"]; *People v. Alcala* (1984) 36 Cal.3d 604, 626, superseded by statute on other grounds as stated in *People v. Falsetta* (1999) 21 Cal.4th 908, 911 ["when one . . . brings along a deadly weapon which he subsequently employs, it is reasonable to infer that he considered the possibility of homicide from the outset"].) In addition to the normal inference raised by defendants simply having acquired the AK-47 for use in the shootings, the evidence also showed they discussed a plan to retaliate for the assault on Johnson by carrying out a drive-by shooting, retrieved the AK-47 from Cerda's house, drove back to Marco's house where they talked about their plan some more, and then drove to Katrina Place to put the plan into action. Contrary to Cerda's suggestion that Pedro only knew there was a plan to retaliate in some unspecified manner, Pedro told police the defendants planned to "retaliate against the people" who had assaulted Johnson by "shoot[ing] at that fucker."

After Johnson shot at the Katrina Place house, the defendants decided to continue their "mission" by driving to Morning Circle in order to carry out a second drive-by shooting against the rival Val Verde Park gang. "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the

16

duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .' [Citations.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 767.)

And finally, by firing the AK-47 multiple times at the two houses, the defendants engaged in a manner of attempted killing tending to show premeditation and deliberation. (See *People v. Silva* (2001) 25 Cal.4th 345, 369 ["The manner of killing – multiple shotgun wounds inflicted on an unarmed and defenseless victim who posed no threat to defendant – is entirely consistent with a premeditated and deliberate murder."]; *People v. Vorise* (1999) 72 Cal.App.4th 312, 318-319 [premeditation and deliberation established where evidence showed defendant calmly shot incapacitated victim in chest twice at close range].) Johnson and Cerda used a military assault rifle so powerful its bullets were known to penetrate the walls of houses. At Katrina Place, it appears almost all the shots did penetrate the house. Although only one bullet actually penetrated the house at Morning Circle, the other bullets were found embedded in the exterior stucco walls of the house. There can be no doubting the potential lethality of defendants' conduct.

In sum, the evidence showed defendants intended to do more than just damage the two houses or scare the occupants. Rather, the evidence showed the defendants intended to kill the victims.

(2) *Guilt based on natural and probable consequences doctrine for non-shooting incidents.*

As discussed, *ante*, the evidence showed each defendant intended to kill, both when he fired the AK-47 and when he directly aided and abetted his codefendant's firing of the weapon. In addition, however, the evidence also showed that under the natural and probable consequences doctrine each defendant was guilty of premeditated attempted murder for the shots fired by his codefendant, even if the non-shooter's only intent had been to violate section 246 (shooting at an occupied dwelling house).

" 'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended

17

crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.]' [Citation.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 920.)

In *Medina*, the defendants planned to beat up Barba, a rival gang member. But after Barba managed to defend himself, one of the defendants pulled out a gun and shot at Barba's car as he and a passenger were driving away, killing Barba. All three defendants were convicted of first degree murder and premeditated attempted murder. Affirming the convictions, *Medina* held the deadly outcome was a natural and probable consequence of the plan to beat up the victim: "Given the gang-related purpose of the initial assault and the fact that, despite being outnumbered, Barba exhibited strength against three aggressors who could not avenge themselves in response to what they considered disrespectful behavior by Barba, the jury could reasonably have found that a person in defendants' position (i.e., a gang member) would have or should have known that retaliation was likely to occur and that escalation of the confrontation to a deadly level was reasonably foreseeable as Barba was retreating from the scene. [Citation.]" (*People v. Medina*, *supra*, 46 Cal.4th at pp. 922-923.) "[I]n the gang context, it was not necessary for there to have been a prior discussion of or agreement to a shooting, or for a gang member to have known a fellow gang member was in fact armed. [Citation.]" (*Id*. at p. 924.)

The evidence here is much stronger than in *Medina* because Johnson and Cerda planned to use the AK-47 from the very beginning. The jury could have reasonably found each defendant intended to aid and abet the offense of shooting at an occupied dwelling house in circumstances where it was reasonably foreseeable his codefendant would instead commit attempted murder. (See, e.g., *People v. Mendoza* (1998) 18 Cal.4th 1114, 1123 [second degree murder and attempted murder could be natural and probable consequences of shooting at occupied building in non-gang retaliation shooting

18

after altercation at party]; *People v. Montes* (1999) 74 Cal.App.4th 1050, 1054-1057 [attempted murder as natural and probable consequence of simple assault and breach of the peace in gang context]; *People v. Lucas* (1997) 55 Cal.App.4th 721, 732-735 [second degree murder as natural and probable consequence of brandishing]; *People v. Laster* (1997) 52 Cal.App.4th 1450, 1465 [attempted murder as natural and probable consequence of discharging firearm from a vehicle]; *People v. Montano* (1979) 96 Cal.App.3d 221, 225-227, superseded by statute on other grounds as stated in *In regarding John R.* (1981) 116 Cal.App.3d 940, 944 [attempted murder as natural and probable consequence of plan to beat up rival gang members].)

In sum, there was overwhelming evidence in support of the premeditated attempted murder convictions.

2. *Natural and probable consequence instructions given to Cerda's jury were erroneous as to his murder conviction only.*

a. *Cerda's first degree murder conviction must be reversed.*

In our original opinion in this matter (an unpublished decision issued July 18, 2013), we concluded, with respect to the Katrina Place shootings, that there was sufficient evidence to sustain Cerda's convictions on both the multiple premeditated attempted murder counts and the first degree murder count for the death of Salazar. Subsequently, however, our Supreme Court held in *People v. Chiu* (2014) 59 Cal.4th 155, 158-159, that "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles. [Citation.]" *Chiu* reasoned that "punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*Id.* at p. 166.)

We therefore recalled the remittitur in this case, and requested supplemental briefing from Cerda and the Attorney General, because this new decision raised the possibility Cerda's first degree murder conviction should not have been affirmed. As

19

*Chiu* explained: "When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. [Citations.] Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder. [Citation.]" (*People v. Chiu, supra,* 59 Cal.4th at p. 167.) Because Cerda's jury was instructed on a direct aiding and abetting theory as well as a natural and probable consequences theory, the jury may have convicted him on the legally invalid theory.

The Attorney General properly concedes that, "as in *Chiu*, the jury here was instructed that it could find an aider and abettor guilty of 'murder' based on the natural and probable consequence theory. This improperly allowed the jury to find that [Cerda] was guilty of first degree premeditated murder as a natural and probable consequence of shooting at an occupied house." (AG SuppBr. 4) However, the Attorney General goes on to argue this error was harmless because the prosecutor used closing argument to highlight evidence showing Johnson and Cerda had "intended to kill somebody at [the Katrina Place] house." The Attorney General asserts "this Court can conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that appellant Cerda directly aided and abetted the murder of Salazar, and that he did so with premeditation." We disagree.

The evidence of Cerda's intent to kill, while very strong, was not overwhelming. Although the evidence clearly showed Cerda had a revenge motive for carrying out the drive-by shooting at Katrina Place, the crucial question is whether his intent was to kill one or more of the occupants, or just to "shoot up the house" in the sense of peppering it with gunfire. The trial evidence could have been read as supporting a conclusion Cerda merely intended to scare the party-goers at Katrina Place rather than kill them. That is, although Pedro told police the plan was to retaliate against "the people" who had beaten up Johnson, and to "go shoot at that fucker," this could have been seen as merely indicating an intent to scare rather than kill. There was other evidence at least suggesting

20

the plan had been only to shoot at the house. Cerda told his father (with respect to the immediately subsequent Morning Circle shooting), "I shot at a house but I didn't kill nobody." Johnson agreed with a detective's assertion the defendants had decided "to go shoot the [Katrina Place] house up" for revenge. Johnson told the detectives, "I didn't mean to hurt nobody."

In an implicit acknowledgment of this problem at trial, the prosecutor invited the jurors to rely on the natural and probable consequences doctrine to support a first degree murder verdict if they were unconvinced Cerda had the intent to kill. The prosecutor argued: "[L]et's even say that one of you at this point says, look, I don't think . . . they intended to kill anyone. I think that they were just shooting into a home and somebody just happened to die. [¶] The law says, even that is sufficient for you to convict of murder. Why is that? There's something called natural and probable consequences." The prosecutor continued: "Let me ask you this. I give you an AK-47 with 20 some odd rounds in it knowing that you are going to shoot up a house. An occupied house. You shoot up that house. Do I know that it's a natural and probable consequence that someone is going to die? Yeah. Unless I have an I.Q. of two, I know lighting up a house with an assault rifle, somebody is going to die. Cerda certainly knew that. And as such, he is guilty. He is guilty of the crime of murder. [¶] So would a reasonable person know? Yes. He knew that having Kyle Johnson shoot up that house, that somebody was going to die."

Hence, we cannot determine beyond a reasonable doubt that the jury must have found Cerda intended to aid and abet the murder of Salazar, as opposed to relying on the invalid natural and probable consequences theory.

In *Chiu* our Supreme Court held that if there was no basis in the record to conclude the jury relied on the legally valid direct aiding and abetting theory, the proper remedy is to "reverse[ ] the first degree murder conviction, allowing the People to accept a reduction of the conviction to second degree murder or to retry the greater offense. . . . If the People choose to retry the case, they may seek a first degree murder conviction under a direct aiding and abetting theory." (*People v. Chiu, supra,* 59 Cal.4th at p. 168.)

21

Cerda argues the only proper remedy is reducing his conviction to second degree murder because, inasmuch as Johnson was only convicted of second degree murder, allowing a retrial would encourage a jury to reach an inconsistent verdict. But our Supreme Court has sanctioned inconsistent premeditation findings (see *People v. Palmer* (2001) 24 Cal.4th 856, 866-867), and Cerda's argument appears to be based on the misconception that an aider and abettor can be liable for no greater offense than is the direct perpetrator. (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1120 [actual perpetrator had less culpable state of mind than accomplice]; see also *People v. Nero* (2010) 181 Cal.App.4th 504, 507 [*McCoy* "held that an aider and abettor may be found guilty of *greater* homicide-related offenses than those the actual perpetrator committed."].)

We will vacate Cerda's first degree murder conviction and remand his case to the trial court for further proceedings.

b. *Cerda's premeditated attempted murder convictions must be affirmed.*

Cerda contends the jury instructions improperly allowed him to be convicted for attempted murder on a natural and probable consequences theory, without having to find Johnson committed premeditated murder and that premeditated attempted murder had been foreseeable. Apart from our discussion, *ante*, explaining why the natural and probable consequences instructions were erroneous with respect to Cerda's first degree murder conviction, we conclude there was no error as to any other jury verdict.

(1) *Background.*

The trial court instructed Cerda's jury on the natural and probable consequences doctrine as follows:

"Before you decide whether the defendant is guilty of murder or attempted murder on a natural and probable consequence theory, you must decide whether he is guilty of shooting at an occupied house.

"To prove that the defendant is guilty of murder or attempted murder, the People must prove that:

22

"The defendant is guilty of shooting at an occupied house; during the commission of shooting at an occupied house, the defendant, or co-participant in that offense, committed the crime of murder or attempted murder; and under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder or attempted murder was a natural and probable consequence of the commission of shooting at an occupied house.

"A co-participant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent by-stander.

"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If the murder or attempted murder was committed for a reason independent of the common plan to commit shooting at an occupied house, then the commission of murder or attempted murder was not a natural and probable consequence of shooting at an occupied house.

"To decide whether the crimes of murder or attempted murder were committed, please refer to the separate instructions that I have given you."

(2) *Discussion*.

Cerda initially claimed in his opening brief that "as to counts to which [he] was merely an aider and abettor, counts 1 through 14, the NPC [natural and probable consequences] theory applies only when there is another person who actually committed a first degree murder or premeditated attempted murder with the required mental state. The instructions which merely alluded to 'murder' and attempted murder without mentioning 'premeditation' do not adequately convey to the jury that it cannot find an aider and abettor guilty under an NPC theory unless it also determines that a perpetrator committed first degree murder or premeditated attempted murder. CALCRIM 403, as given in this case, and in combination with the arguments of counsel, failed to make this clear."

23

This contention was based on *People v. Hart* (2009) 176 Cal.App.4th 662, but, as Cerda acknowledges in his reply brief, our Supreme Court overruled *Hart* in *People v. Favor* (2012) 54 Cal.4th 868, which held: "[W]ith respect to the natural and probable consequences doctrine as applied to the premeditation allegation under section 664(a) [the statute defining premeditated attempted murder], attempted murder – not attempted premeditated murder – qualifies as the nontarget *offense* to which the jury must find foreseeability. Accordingly, once the jury finds that an aider and abettor, in general or under the natural and probable consequences doctrine, has committed an attempted murder, it separately determines whether the attempted murder was willful, deliberate, and premeditated. [¶] Under the natural and probable consequences doctrine, there is no requirement that an aider and abettor reasonably foresee an attempted premeditated murder as the natural and probable consequence of the target offense. It is sufficient that attempted murder is a reasonably foreseeable consequence of the crime aided and abetted, and the attempted murder itself was committed willfully, deliberately and with premeditation." (*Id*. at pp. 879-880.)[4]

Cerda has responded to the *Favor* opinion by withdrawing only "the portion of his argument which pertains to premeditated attempted murder. His argument is still valid regarding . . . all attempted murder convictions. Although the instructions were not facially incorrect as to attempted murder, the prosecutor's argument was wrong in stating that the aider and abettor must foresee only the act engaged in by the perpetrator, rather than the crime committed by the perpetrator." Cerda argues: "The error is prejudicial because the act of shooting at an inhabited dwelling may be a mere assault, or an attempted murder, depending on the mental state of the shooter and the likelihood of a murder occurring. The NPC theory of liability as portrayed by the parties alleviated the

---

[4]     To the extent Johnson claims he was unfairly prejudiced by the CALCRIM Nos. 403 and 601 instructions, he is ignoring the fact his premeditated attempted murder liability rests on two different theories: his intent to kill at Katrina Place, and Cerda's intent to kill at Morning Circle.

24

jury's need to find that Cerda foresaw or should have foreseen . . . an attempted murder by Johnson. It lightened the prosecutor's burden of proof. [¶] . . . Nothing in *Favor* changes the analysis of this error."

Cerda complains the prosecutor's closing argument conflated the notions of "murder" and "mere homicide" by telling the jury things like: "We all know what murder is. It's very simple. Somebody does something and another person dies. So that's what murder is." Cerda also complains the prosecutor improperly made no distinction between perpetrators and aiders and abettors by arguing: "[L]et's even say that one of you at this point says . . . I don't think they intended to kill anyone. I think they were just shooting into a home and somebody just happened to die." Cerda argues this meant his "jury was not called upon to make any determination about Johnson's mental state. It was called upon only to determine whether 'someone died' as a result of Johnson's shooting at the house."

We are not persuaded by Cerda's arguments.

" 'In reviewing [a] purportedly erroneous instruction[ ], "we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." [Citation.] In conducting this inquiry, we are mindful that " 'a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' " [Citations.]' [Citation.] 'Additionally, we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.)

Although the natural and probable consequences instruction only named "murder" and "attempted murder" as the charged non-target crimes, the final sentence of the instruction told the jury: "To decide whether the crimes of murder or attempted murder were committed, please refer to the separate instructions that I have given you." Those separate instructions explained the elements of murder and then said: "If you decide that the defendant has committed murder, you must decide whether it is murder of the first or second degree." Similarly, the jury was told that if it found a defendant guilty of

25

attempted murder, it then had to decide if "the People have proved the additional allegation that the attempted murder was done willfully and with premeditation and deliberation." Hence, the natural and probable consequence instructions provided the clarification Cerda asserts was needed by referring the jury to other instructions.

As for the prosecutor's closing argument allegedly misleading the jury, Cerda's record citations have been taken out of context. Contrary to Cerda's suggestion, the prosecutor did argue the defendants intended to kill people. The prosecutor told the jury: "[Cerda and Johnson] intended to kill somebody at that house. We know that. There was motive for that. He was trying to get back at the people who beat him up. LMS was there trying to take down a house that for them portrayed 18th Streeters who had disrespected their gang and one of their homies. They were there to kill." "The people who went out that night armed with an AK-47 were going hunting. They were going hunting that night. Hunting for rivals. Hunting for people who had disrespected them and their gang. [¶] . . . They were hunting for humans beings that they could shoot and kill."

The prosecutor made it clear he was not talking about an accidental death. For instance, the prosecutor's *complete* statement was: "Murder, that's what we are here about. Murder, as the judge read to you is this. A person committed an act that caused the death of another and he did so with malice aforethought. [¶] It's not hard. It's not a hard concept. We all know what murder is. It's very simple. Somebody does something and another person dies. So that's what murder is." The prosecutor went on to explain malice aforethought and the concepts of express and implied malice. The prosecutor clearly told the jury it had to find Johnson committed murder in order for Cerda to be guilty on an aiding and abetting theory: "But in order to get to that, did [Cerda] aid and abet Kyle Johnson in killing somebody, we have to make sure . . . *was there a murder* and did he aid and abet [?]." (Italics added.)

The prosecutor also clearly argued there had been a premeditated intent to kill: "[T]his wasn't an instantaneous decision where the gun is there, somebody gets beat up at the party and somebody has a gun in their waist band . . . and as soon as they get beat up,

26

they pull out a gun and shoot somebody.  That's not the scenario.  [¶]  The scenario is . . . . [someone] gets beat up.  They go back to a location, think about what's going to happen. . . .  [¶]  They are talking about it.  They are thinking about it.  20, 30 minutes, an hour has gone by.  They have also had to get into their car, driven down to the location, circled the block.  One of them pops up with the gun and starts shooting.  [¶]  That is premeditation, deliberation, and that's done willfully."

Hence, we conclude that, viewed in context, the jury was not reasonably likely to have construed the natural and probable consequences instructions in a manner that violated Cerda's rights.

3.  *The CALCRIM No. 400 instruction does not mandate reversal.*

Defendants contend their convictions must be overturned because the trial court instructed the jury with a superseded version of CALCRIM No. 400.  This claim is meritless.

a.  *Background.*

The trial court instructed the jury with CALCRIM No. 400, as follows:  "A person may be guilty of a crime in two ways:  One, he may have directly committed the crime. I will call that person the perpetrator.  Two, he may have aided and abetted a perpetrator who directly committed the crime.  A person is equally guilty of the crime whether he committed it personally or aided and abetted the perpetrator who committed it."  CALCRIM No. 400 has since been amended to eliminate the "equally guilty" language and the final sentence now reads:  "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

Johnson and Cerda contend they were prejudiced by the "equally guilty" formulation in the old version of CALCRIM No. 400 because it improperly tethered each defendant's culpability for premeditated attempted murder, as well as Cerda's liability for first degree murder, to the mental state of his codefendant.

b. *Legal principles.*

"Because aiders and abettors may be criminally liable for acts not their own, cases have described their liability as 'vicarious.' [Citation.] This description is accurate as far as it goes. But, as we explain, the aider and abettor's guilt for the intended crime is not entirely vicarious. Rather, that guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*People v. McCoy, supra,* 25 Cal.4th at p. 1117.) "Aider and abettor liability is . . . vicarious only in the sense that the aider and abettor is liable for another's actions as well as that person's own actions. When a person 'chooses to become a part of the criminal activity of another, she says in essence, "your acts are my acts . . . . " ' [Citation.] But that person's *own* acts are also her acts for which she is also liable. Moreover, that person's mental state is her own; she is liable for her mens rea, not the other person's." (*Id.* at p. 1118.)

In *People v. Nero, supra,* 181 Cal.App.4th at p. 507, we noted *McCoy* "held that an aider and abettor may be found guilty of *greater* homicide-related offenses than those the actual perpetrator committed. Extending that holding, we conclude that an aider and abettor may be found guilty of *lesser* homicide-related offenses than those the actual perpetrator committed." Similarly, *People v. Samaniego* (2009) 172 Cal.App.4th 1148, held: "Though *McCoy* concluded that an aider and abettor could be guilty of a greater offense than the direct perpetrator, its reasoning leads inexorably to the further conclusion that an aider and abettor's guilt may also be less than the perpetrator's, if the aider and abettor has a less culpable mental state. [Citation.] Consequently, CALCRIM No. 400's direction that '[a] person is *equally guilty* of the crime [of which the perpetrator is guilty] whether he or she committed it personally or aided and abetted the perpetrator who committed it' [citation], while generally correct in all but the most exceptional circumstances, is misleading here and should have been modified." (*Id.* at pp. 1164-1165.)

c. *Discussion*.

Based on *Nero* and *Samaniego*, defendants argue the instructions given to their juries lessened the prosecution's burden of proof by not requiring that each defendant's culpability be determined independently. We disagree.

(1) *Natural and probable consequences aspect of defendants' claim*.

In the first place, we note defendants' claim does not affect the aiding and abetting instructions as they relate to the natural and probable consequences doctrine. The same court that decided *Samaniego* subsequently pointed out in *People v. Canizalez* (2011) 197 Cal.App.4th 832, that "neither *McCoy* nor *Samaniego* [nor, we would add, *Nero*] involved the natural and probable consequences doctrine. Each reached its conclusion only for aiders and abettors of a target offense. *McCoy* expressly stated, 'Nothing we say in this opinion necessarily applies to an aider and abettor's guilt of an unintended crime under the natural and probable consequence doctrine.' [Citation.] Its analysis was only to apply 'when guilt does not depend on the natural and probable consequences doctrine. . . .' [Citation.]" (*Id.* at p. 851.)

*Canizalez* went on to explain: "Aider and abettor culpability under the natural and probable consequences doctrine for a nontarget, or unintended, offense committed in the course of committing a target offense has a different theoretical underpinning than aiding and abetting a target crime. Aider and abettor culpability for the target offense is based upon the intent of the aider and abettor to assist the direct perpetrator commit the target offense. By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. [Citation.] Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime. It follows that the aider and abettor will always be 'equally guilty' with the direct perpetrator of an unintended crime that is

29

the natural and probable consequence of the intended crime. [¶] Consequently, the statement in CALCRIM former No. 400 that '[a] person is *equally guilty* of the crime [of which the perpetrator is guilty] whether he or she committed it personally or aided and abetted the perpetrator who committed it' [citation], is a correct statement of the law when applied to natural and probable consequence aider and abettor culpability . . . ." (*People v. Canizalez, supra,* 197 Cal.App.4th at p. 852.)

Hence, defendants' claim only relates to the prosecution theory that, as to the "non-shooting acts," i.e., Cerda's role at Katrina Place and Johnson's role at Morning Circle, they were directly aiding and abetting the other defendant's firing of the AK-47.

In *Nero*, we found instructional error because the jury expressly asked the trial court if an aider and abettor's guilt could be less than the perpetrator's. Instead of correctly answering yes, the trial court simply reread the standard aiding and abetting instructions. We held: "[W]here, as here, the jury asks the specific question whether an aider and abettor may be guilty of a lesser offense, the proper answer is 'yes,' she can be. The trial court, however, by twice rereading CALJIC No. 3.00 in response to the jury's question, misinstructed the jury." (*People v. Nero, supra,* 181 Cal.App.4th at p. 518.)

As *Nero* explained: "[T]he jury indicated it was considering an outcome other than second degree murder for Brown. It expressly asked whether Brown, as the aider and abettor, could 'receive a higher or lesser degree of murder, manslaughter, or innocence?' When the trial court's reinstruction on reasonable doubt did not satisfy the jury, the foreperson asked if, for example, they were to find defendant *A* guilty of second degree murder, would the aider and abettor also be guilty of second degree murder 'or could they be held to the level of the manslaughter, or completely innocent?' Then, when asked if the aider and abettor could 'bear less responsibility,' the court only said the person could be found not guilty. But the jury's expressed concern was not whether it could acquit the aider and abettor, but whether the aider and abettor had to be found guilty of 'the same level, murder two or manslaughter, or could they be at a lower level?' Without consulting counsel, the court reread, twice, CALJIC No. 3.00, which states: 'Each principal, regardless of the extent or manner of participation, is *equally guilty*.'

30

(Italics added.) The jurors then indicated that the instruction answered their question. The next day they found both defendants guilty of second degree murder. [¶] It is therefore clear that the jury was considering whether to impose a lesser degree or offense on the aider and abettor. Notwithstanding that other instructions might have given them that option, there is a reasonable possibility that the trial court's response to their questions improperly foreclosed it." (*People v. Nero, supra,* 181 Cal.App.4th at pp. 519-520.)

Johnson argues something similar happened in this case, as shown by a series of notes the jury sent out to the trial court during deliberations. However, as Johnson concedes, these notes did not expressly ask if an aider and abettor had to be found guilty of the same degree of attempted murder as the direct perpetrator.[5]

In addition, any potential confusion was necessarily resolved by other instructions. Under CALCRIM No. 401 (aiding and abetting intended crimes), the People had to prove: Cerda committed the crime; Johnson knew Cerda intended to commit the crime; Johnson intended to aid and abet Cerda in committing the crime; and, Johnson's words or conduct did in fact aid and abet Cerda's commission of the crime. CALCRIM No. 600 said that, to convict Johnson of attempted murder, the People had to prove he intended to kill the victim. As in *People v. Mejia* (2012) 211 Cal.App.4th 586, the "equally guilty" language did not result in any error because the jury "was also instructed that an aider and

---

[5]    Johnson argues the four notes "implied" the jury was asking this question. We disagree. The first note asked: "Would it be the same charge, murder one, if Kyle Johnson shot the gun or did not but was in the car, because we are confused on the law. First degree or second." The second note asked if, when considering the definition of implied malice, the jury could ignore its fourth element: deliberately acting with conscious disregard for human life. The third note read: "By agreeing to an aid or aider [*sic*] charge which would result in guilt, would the implied or express malice be considered." A fourth note read: "Can we use the aider and abettor theory of liability to find the defendant guilty of attempted murder?" Most of the notes expressly relate to the murder charge, on which Johnson was convicted of the lesser offense, second degree murder. The attempted murder note appears to be asking about the difference between two theories of guilt: direct perpetrator versus aiding and abetting.

31

abettor must (1) *know* of the perpetrator's unlawful purpose, (2) *intend* to facilitate or assist that unlawful purpose, and (3) *act* in some manner that does assist or facilitate the unlawful purpose. . . . This instruction advised the jury that it must base its decision of each appellant's liability not simply on the mental state of the direct perpetrator of the crime, but on that appellant's state of mind and the extent to which he knew of and intended to facilitate the purpose contemplated by the perpetrator. [¶] Unlike *McCoy* and *Nero*, where the evidence suggested the principals might have differing states of mind and therefore might be guilty of different crimes, the evidence in this case did not: the evidence overwhelmingly showed that all four appellants, plus Lorenzo, went to the location to kill Pulido." (*Id*. at p. 625.)[6]

In *Nero*, we concluded the "equally guilty" language was not harmless because crucial evidence about how the victim came to be stabbed was in dispute. The victim in *Nero* had been stabbed during a spontaneous parking lot confrontation and there was conflicting evidence as to whether the defendant, her codefendant or the victim had first produced the knife, and whether the defendant had encouraged the murder or instead tried to stop it. There was no such crucial evidentiary dispute in the case at bar. The defendants planned to carry out a drive-by shooting at Katrina Place using extremely lethal weaponry to avenge Johnson's beating. As Cerda acknowledges: "[T]here is no dispute that Cerda knew Johnson planned to shoot at the Katrina house and that Cerda assisted Johnson by furnishing the gun. There is some evidence of verbal encouragement." Johnson told police that after he shot up the Katrina Place house from the back of Casillas's truck, he switched places with Cerda "[a]nd then we took [Cerda] to the [Val Verde Park] house." Cerda does not deny he then shot up the Morning Circle house.

The trial court did not err by giving CALCRIM No. 400. Even assuming arguendo it did, the error was harmless as to both defendants.

---

[6]     In *Mejia*, gang members assaulted a rival gang member who managed to kill one of the attackers, resulting in a provocative-act murder prosecution.

4. *Trial court did not err by failing to instruct on shooting at an occupied dwelling as a target offense.*

Defendants contend all the convictions predicated on the natural and probable consequences doctrine must be reversed because the trial court failed, sua sponte, to give the jury an opportunity to convict on shooting at an inhabited dwelling house (§ 246) as a lesser included offense. This claim is meritless.

In this case, shooting at an inhabited dwelling house was merely a lesser related offense of the charged crimes (murder and attempted murder) and, as Cerda acknowledges, a trial court has no duty to instruct on lesser related offenses. (*People v. Birks* (1998) 19 Cal.4th 108.) Instead, Cerda invites us to fashion a new rule, holding that "[i]n these circumstances, the target crime is the functional equivalent of an element of the crime as pleaded, and failure to regard it as a lesser included offense is constitutional error" because "the defense in this case was, precisely, that the only crime [he] committed was firing at an occupied dwelling." We decline to create such a new rule.

Moreover, even if such a rule existed, it would not have aided either defendant in the circumstances of this case. "The erroneous failure to instruct on a lesser included offense generally is subject to harmless error review under the standard of *People v. Watson* (1956) 46 Cal.2d 818, at pages 836-837 . . . . Reversal is required only if it is reasonably probable the jury would have returned a different verdict absent the error or errors complained of. [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 867-868, fn. omitted.) "In determining whether a failure to instruct on a lesser included offense was prejudicial, an appellate court may consider 'whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citations.]" (*Id.* at p. 870.) That is precisely the situation here.

Even if the juries had been instructed they could convict defendants of shooting at an inhabited dwelling house, it is not reasonably probable they would have done so. As

to Cerda, there was overwhelming evidence that murder and attempted murder were the foreseeable results of his aiding and abetting Johnson's shooting at the Katrina Place house. Cerda was an intimate partner in Johnson's plan to carry out this drive-by shooting to avenge his beating there earlier in the evening. According to Pedro, the plan was to retaliate against the people who had assaulted Johnson by shooting them. Cerda retrieved the wall-piercing AK-47 for Johnson to use. Cerda acknowledges he encouraged Johnson to carry out the drive-by shooting.

Although the foreseeability evidence as to the Morning Circle shooting was thinner, it was still substantial. Johnson told police that, after shooting up Katrina Place, he handed the AK-47 to Cerda and changed places with him, returning to the cab of the truck so Cerda could take up the shooting position inside the truck bed. Johnson told police: "And then we took [Cerda] to the [Morning Circle] house." The power of this circumstantial evidence of Johnson's intent was magnified by the fact he did this *right after* having himself committed murder and attempted murder at Katrina Place with the AK-47. In addition, unlike Cerda, Johnson's defense at trial was not that he merely intended to shoot at a building, but that he had not even been present that night, an alibi defense the jury did not buy. We conclude there is no reasonable probability Johnson's jury would have convicted him only of violating section 246 if given the opportunity.

Hence, we find the trial court did not err by failing to instruct on section 246 as a charged crime and, in any event, such an instruction would not have helped the defendants.

5. *The kill zone instruction was not improper.*

Defendants contend their convictions must be reversed because the trial court improperly instructed the jury on the so-called "kill zone" concept. This claim is meritless.

34

a.  *Background.*

As explained in *People v. Bland* (2002) 28 Cal.4th 313:  "The conclusion that transferred intent does not apply to attempted murder still permits a person who shoots at a group of people to be punished for the actions towards everyone in the group even if that person primarily targeted only one of them."  (*Id.* at p. 329.)  Concurrent intent exists " 'when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.  For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed.  Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group.  The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. . . .  Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.' "  (*Id.* at pp. 329-330.)

The trial court here instructed each jury:  "A person may intend to kill a specific victim, or victims, and at the same time intend to kill anyone in a particular zone of harm or kill zone.  In order to convict the defendant of the attempted murder of the victims named in counts 2 through 24, the People must prove that the defendant not only intended to kill someone but also either intended to kill the victims named in counts 2 through 24 or intended to kill anyone within the kill zone.  [¶]  If you have a reasonable doubt whether the defendant intended to kill the victims named in counts 2 through 24, or intended to kill someone by killing everyone in the kill zone, then you must find the

35

defendant not guilty of the attempted murder of the victims named in counts 2 through 24."**7**

   b.  *Discussion*.

Johnson argues the kill zone instruction was "flawed because it permitted a finding of guilt on each and every attempted murder count even if the jury found only the intent [to] kill *someone* but *not everyone*.  At best, the language is ambiguous.  The trial court had a duty to clarify otherwise confusing and potentially misleading instructions."  But in *People v. Stone* (2009) 46 Cal.4th 131, our Supreme Court concluded:  "In context, a jury hearing about the intent to kill *anyone* within the kill zone would probably interpret it as meaning the intent to kill *any* person who happens to be in the kill zone, i.e., *everyone* in the kill zone."  (*Id*. at p. 138, fn. 3.)

Cerda argues the kill zone instruction had no application to the facts of this case for two reasons:  "The first is that there was no primary target by which to define any 'zone' to the extent the concept has spatial boundaries.  The second is that all previous kill zone cases have involved persons either visible to the perpetrator or known to be present, like the other passengers on an airplane in the (often noted) bomber example."  We disagree.

Contrary to Cerda's assertion, there was indeed primary target evidence in this case.  At Katrina Place, the intended targets were the 18th Street gang members who had assaulted Johnson; at Morning Circle the intended targets were the rival Val Verde Park gang members.  And there is no requirement all the victims must have been visible.  In *Bland*'s bomb-on-the-plane example, the bomber's liability presumably would not be limited by an incorrect estimation of how many passengers were actually on board. "Whether or not the defendant is aware that the attempted murder victims were within the zone of harm is not a defense, as long as the victims actually were within the zone of harm."  (*People v. Adams* (2008) 169 Cal.App.4th 1009, 1023.)

---

**7**      The two juries were instructed in virtually identical language.

36

*People v. Vang* (2001) 87 Cal.App.4th 554, is the seminal case involving a drive-by shooting which targets an occupied residence. The defendants there were convicted on murder and multiple attempted murder counts after carrying out drive-by shootings at two residences. On appeal, the defendants argued the attempted murder evidence was deficient because it failed to prove they intended to kill any of the inhabitants other than two individuals they had been specifically targeting. The trial court rejected this claim, finding "[t]he jury drew a reasonable inference, in light of the placement of the shots, the number of shots, and the use of high-powered, wall-piercing weapons, that defendants harbored a specific intent to kill every living being within the residences they shot up. [Citations.] . . . Stated briefly, section 188 provides that malice aforethought 'is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.' In this case, defendants manifested a deliberate intention to unlawfully take the lives of others when they fired high-powered, wall-piercing, firearms at inhabited dwellings. The fact they could not see all of their victims did not somehow negate their express malice or intent to kill as to those victims who were present and in harm's way, but fortuitously were not killed." (*Id*. at pp. 563-564, fn. omitted.)

Cerda's reliance on *People v. McCloud* (2012) 211 Cal.App.4th 788, is misplaced. There, the defendants fired 10 bullets from a semiautomatic handgun, shooting from a parking lot into a Masonic Lodge where a party was going on. The defendants killed two victims and wounded a third. They were convicted on two counts of second degree murder and 46 counts of either attempted murder (one defendant) or assault with a firearm (the other defendant). *McCloud* held this result could not be justified by the kill zone theory: "In order for the kill zone theory to support 46 attempted murder convictions in the manner suggested by respondent, the record would have to contain evidence that Stringer and McCloud tried to kill the person who punched Stringer by killing all 46 people in the area where Stringer's assailant was located. But the record contains no evidence that Stringer or McCloud intended to kill 46 people with 10 bullets. Nor does the record contain evidence that it would have been possible for them to kill 46 people with 10 bullets (given the type of ammunition and firearm they used), or that they

37

believed or had reason to believe it was possible. On the contrary, the evidence tended to show that it was not possible – of the three bullets that struck Moses, Taylor, and Gaines, all three lodged in their bodies rather than exiting. . . . [T]here is no evidence that Stringer and McCloud 'specifically intended to kill two or more persons with [a] single shot' [citation], much less that they specifically intended to kill the 4.6 people per shot that would be necessary to support respondent's application of the kill zone theory." (*Id*. at pp. 799-800, fn. omitted.)

But *McCloud* specifically acknowledged the significant difference between its facts and the drive-by shootings in *Vang*. As *McCloud* pointed out: "The Court of Appeal [in *Vang*] held that the evidence was sufficient to sustain those attempted murder convictions, because '[t]he jury drew a reasonable inference, in light of the placement of the shots, the number of shots, *and the use of high-powered, wall-piercing weapons*, that defendants harbored a specific intent to kill every living being within the residences they shot up.' [Citation.] *People v. Vang* preceded *Bland*, but *Bland* cited it with approval and characterized it as a kill zone case 'even though [it did] not employ that term.' [Citation.]" (*People v. McCloud, supra,* 211 Cal.App.4th at p. 800, fn. 5.)

The facts here are similar to *Vang*, not *McCloud*. Defendants used a military-style assault rifle with wall-piercing ammunition, not the far less powerful handgun used in *McCloud*. The trial court's kill zone instructions were not erroneous.

6. *Ineffective assistance of counsel: Johnson*

Johnson contends he was denied effective assistance of counsel because his attorney failed to ask for a jury instruction on voluntary intoxication. This claim is meritless.

a. *Background*.

A claim of ineffective assistance of counsel based on *Strickland v. Washington* (1984) 466 U.S. 668 [104 S.Ct. 2052], has two components: " 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient

38

performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' [Citation.]  To establish ineffectiveness, a 'defendant must show that counsel's representation fell below an objective standard of reasonableness.'  [Citation.]  To establish prejudice he 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'  [Citation.]"  (*Williams v. Taylor* (2000) 529 U.S. 362, 390-391.)  "[T]he burden of proof that the defendant must meet in order to establish his entitlement to relief on an ineffective-assistance claim is preponderance of the evidence."  (*People v. Ledesma* (1987) 43 Cal.3d 171, 218.)

Former Penal Code section 22,[8] provided:

"(a)  No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition.  Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.

"(b)  Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought.

"(c) Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance."

"An instruction on the significance of voluntary intoxication is a 'pinpoint' instruction that the trial court is not required to give unless requested by the defendant. [Citations.]"  (*People v. Rundle* (2008) 43 Cal.4th 76, 145.)

---

[8]     Section 22 has been renumbered as section 29.4.

b. *Discussion*.

Johnson contends "the trial counsel's failure to request intoxication instructions and rely on an 'all or nothing' approach to the jury's decision making constituted prejudicial ineffective assistance." We disagree.

Johnson argues defense counsel should have requested a voluntary intoxication instruction because there was evidence he ingested methamphetamine before arriving at Jorge's party, that he drank 10 to 15 beers and smoked marijuana while at Jorge's, and that he was already intoxicated by the time he went over to the Katrina Place party. Johnson asserts "[t]here simply could be no tactical or strategic reason to forego such a powerful weapon in the defense arsenal."

We disagree. As the Attorney General points out, the evidence of Johnson's intoxication was not terribly strong. His trial testimony about consuming methamphetamine and a large quantity of beer was contradicted by his police statement, which indicated he had only consumed two to four beers, apparently did not mention methamphetamine at all, and stated he "wasn't like really drunk where [I] don't know what happened."

Moreover, at trial Johnson claimed to have an alibi, testifying he had gone home after being assaulted at Katrina Place and stayed home the rest of the night. Defense counsel could well have reasoned Johnson's testimony made any resort to an intoxication defense impractical because it might have undercut the defense Johnson himself presented.

Johnson has not demonstrated there was ineffective assistance of counsel.

7. *Ineffective assistance of counsel: Cerda.*

Cerda contends he was denied effective assistance of counsel because his trial attorney failed to object to the gang expert's description of entries on a so-called "hard card" indicating Cerda was a gang member. Because these entries had not been made by the testifying expert himself, Cerda contends the evidence violated both California hearsay law and the federal confrontation clause as delineated by *Crawford v.*

40

*Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354]. We conclude Cerda was not denied effective assistance of counsel.

a. *Background.*

Robert Gillis, the gang expert who testified at trial, explained how gang officers collect information on suspected gang members during the daily course of their work. Officers routinely fill out field information or "F.I." cards, small cards they carry around on which they keep track of their contacts with suspected gang members. This information includes the date and location of their contact, name, birth date, address, physical description, driver's license number, gang name, and associates. There are also "hard cards," which are "larger cards that we keep in our offices in the file cabinets." The hard card is a compilation of all the information obtained "either from F.I. cards or other investigation which shows that a particular individual is associated with a particular gang."

Asked what information caused him to believe Cerda was an LMS member, Gillis testified Cerda "was contacted by [Officer] Fender [another member of Gillis's gang unit] on previous occasions. I have personally spoken to him, also, on occasions in Palmdale when I was working gangs down there. And I have contacted him with other members of the gang." Gillis could not recall if Cerda had ever self-admitted to Gillis personally that he was an LMS member. Gillis testified he had reviewed one of the field information cards completed by Fender, as well as Cerda's hard card. According to the hard card, Cerda was affiliated with the LMS gang; that is, next to the box labeled "gang," someone had written "LMS." Another page of the hard card contained a notation made by Officer Pickett indicating Cerda had self-admitted his LMS membership on March 25, 2008.

The following colloquy occurred:

"Q. And do you have an opinion as to Peter Cerda, whether he was a member of LMS on February 10th of 2008.

"A. Yes.

"Q. And what is your opinion?

"A. That he absolutely was.

41

"Q. Why do you base your opinion on that? [*sic*]

"A. Again, with his consistent association with members of LMS and in the same area that they were trying to claim as their turf . . . in Palmdale."

Gillis also testified he was absolutely sure both Johnson and Jose Casillas were LMS members on the day of the shootings.

b. *Discussion.*

Citing the United States Supreme Court's discussion of *Crawford* in *Williams v. Illinois* (2012) 132 S.Ct. 2221 [183 L.Ed.2d 89], Cerda contends Gillis's expert basis testimony had been improperly admitted for its truth. Although the *Williams* plurality concluded expert basis testimony does not violate *Crawford* because it is not admitted for its truth (*id.* at pp. 2227-2228, 2235, plur. opn.), both Justice Thomas's concurrence and the four *Williams* dissenters rejected that analysis, concluding this kind of evidence is admitted for its truth (*id.* at pp. 2255-2256, conc. opn. of Thomas, J.; pp. 2268-2272, dis. opn. of Kagan, J.) This result has been recognized by our Supreme Court. (See *People v. Lopez* (2012) 55 Cal.4th 569, 578-580 [explaining how a majority in *Williams* concluded expert basis testimony is admitted for its truth].)

However, *before* this opinion in *Williams* was issued, the well-established rule in California was that reliable hearsay evidence was admissible under Evidence Code sections 801 and 802 for the non-hearsay purpose of revealing the basis for an expert witness's opinion and, in that context, such evidence was not admitted for its truth. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 618 [expert testimony may be premised on material not admitted into evidence if "it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions" and the expert "can, when testifying, describe the material that forms the basis of the opinion"].) Hence, at the time of Cerda's trial in 2011, the year before *Williams* was announced, an objection to Gillis's testimony about the notations on Cerda's hard card would have been routinely, and properly, denied by the trial court.

Cerda acknowledges this long-standing rule, but argues it has recently been criticized, citing *People v. Hill* (2011) 191 Cal.App.4th 1104. But Cerda neglects to

42

mention that *Hill*, although critical of the *Gardeley* rule, held there was absolutely no question but that this line of cases constituted controlling precedent which must be followed: "Consequently, we may not find erroneous the trial court's conclusion that the challenged statements were not admitted for their truth. This determination precludes appellant's challenge under state hearsay rules and the confrontation clause. [Citation.]" (*People v. Hill, supra,* at pp. 1127-1128.)

The *Hill* opinion was filed on April 20, 2011. Cerda was on trial in February and March 2011. *Williams* was decided in 2012. We cannot see how Cerda's trial attorney could have been reasonably expected to anticipate the subsequent change in law wrought by the *Williams* court. (See *Sophanthavong v. Palmateer* (9th Cir. 2004) 378 F.3d 859, 870 ["*Strickland* does not mandate prescience, only objectively reasonable advice under prevailing professional norms."]; *Spaziano v. Singletary* (11th Cir. 1994) 36 F.3d 1028, 1039 ["We have held many times that '[r]easonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop.' "]; *Nelson v. Estelle* (5th Cir. 1981) 642 F.2d 903, 908 [although "a failure of counsel to be aware of prior controlling precedents in even a single prejudicial instance might render counsel's assistance ineffective under the Sixth Amendment," defense counsel "is normally not expected to foresee future new developments in the law"].)

We conclude Cerda has failed to show that defense counsel's performance was deficient.[9]

_____

[9]    In his reply brief, Cerda states: "*Williams* makes clear that the entry in [the hard card] could not be used for its truth and, upon proper objection by trial counsel, the jury should have been so instructed. Cerda *broadens* his ineffective assistance claim to apply to the combined failure to object or to request a limiting instruction." (Italics added.) Cerda cannot broaden the arguments made in his opening brief to encompass a new claim. "Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief. [Citation.]" (*People v. King* (1991) 1 Cal.App.4th 288, 297, fn. 12; see *People v. Newton* (2007) 155 Cal.App.4th 1000, 1005 ["we do not consider an argument first raised in a reply brief, absent a showing why the argument could not have been made earlier"]; *Moore v. Shaw* (2004) 116 Cal.App.4th 182, 200, fn. 10

43

8. *There was no cumulative error.*

Johnson contends the cumulative prejudicial effect of the various trial errors he has raised on appeal requires the reversal of his conviction. Because we have found no errors, his claim of cumulative error fails. (See *People v. Seaton* (2001) 26 Cal.4th 598, 639; *People v. Bolin* (1998) 18 Cal.4th 297, 335.)

9. *Sentencing error: Cerda.*

Cerda contends the trial court erred by imposing sentences of 35 years to life for the premeditated attempted murder convictions arising out of the Morning Circle shooting (counts 15 through 24). The Attorney General asserts that, while those sentences were proper, the trial court erred by not imposing the same sentences on the premeditated attempted murder convictions arising out of the Katrina Place shooting (counts 2 through 14). Neither claim has merit.

On counts 15 through 24, the trial court imposed a term of 35 years to life for each conviction, consisting of a life term for premeditated attempted murder (§ 664), enhanced by a 15-year minimum parole eligibility term for the gang enhancement (§ 186.22, subd. (b)(5)), and an additional 20-year enhancement for firearm use (§ 12022.53, subd. (c)). Cerda contends the correct sentence was only 27 years to life on each count because "section 12022.53 operates to prevent both a firearm and gang furtherance enhancement from being imposed as to gang members who did not personally use a firearm."

Cerda's claim is based on the special interplay between the gang enhancement statute and the firearm use enhancement statute: "[W]here section 186.22 has been found to be applicable, in order for section 12022.53 to apply, it is necessary only for a principal, not the accused, in the commission of the underlying felony to personally use the firearm; *personal* firearm use by the accused is not required under these specific circumstances. However, as a consequence of this expanded liability under section

---

["Ordinarily, an appellant's failure to raise an issue in its opening brief waives the issue on appeal.].)

12022.53, subdivision (e), the Legislature has determined to preclude the imposition of an additional enhancement under section 186.22 in a gang case unless the accused *personally* used the firearm." (*People v. Salas* (2001) 89 Cal.App.4th 1275, 1281-1282.) However, this principle does not apply here because Cerda personally used the firearm while committing the Morning Circle shooting (counts 15 to 24). Hence, it was proper to impose both a firearm enhancement and a gang enhancement on these counts.

The Attorney General's claim that the same 35-years-to-life term should have been imposed on counts 2 through 14 is also incorrect because those counts related to Katrina Place, where Johnson did the shooting, not Cerda. Therefore, the 15-year minimum parole eligibility term called for by the gang statute did not apply; instead, Cerda was only subject to the seven-year minimum parole eligibility term provided for by section 3046, subdivision (a)(1).[10] (See *People v. Salas, supra,* 89 Cal.App.4th at pp. 1281-1282 [additional enhancement under gang statute only applies when defendant personally used the firearm].)

Hence, the trial court's sentencing of Cerda was not erroneous.

10. *No probation report*.

Cerda contends he must be resentenced because, on the day set for sentencing, the trial court realized no probation report had been prepared but proceeded with sentencing anyway. The trial court directed that a probation report would subsequently be prepared and transmitted to the California Department of Corrections and Rehabilitation. Although defense counsel did not object to this procedure, Cerda claims it violated due process and his Sixth Amendment right to counsel. We disagree.

Cerda was statutorily ineligible for probation because he was subject to firearm use enhancements under section 12022.53. (See § 12022.53, subd. (g).) "[C]ase law has

---

[10]     Section 3046, subdivision (a), provides: "No prisoner imprisoned under a life sentence may be paroled until he or she has served the greater of the following: [¶] (1) A term of at least seven calendar years. [¶] (2) A term as established pursuant to any other provision of law that establishes a minimum term or minimum period of confinement under a life sentence before eligibility for parole."

recognized that a probation report is not necessarily required if defendant is statutorily ineligible for probation." (*People v. Dobbins* (2005) 127 Cal.App.4th 176, 180; accord *People v. Johnson* (1999) 70 Cal.App.4th 1429, 1431-1432; *People v. Llamas* (1998) 67 Cal.App.4th 35, 39.)

In *People v. Murray* (2012) 203 Cal.App.4th 277, superseded by statute on other grounds as stated in *People v. Gutierrez* (2014) 48 Cal.4th 1354, 1370-1371, the defendant claimied his due process rights had been violated because the trial court resentenced him without obtaining a new probation report. *Murray* found no error: "[B]ecause Murray committed murder while personally using a firearm, he was not eligible for probation. [Citation.] Because he was not eligible for probation, no supplemental probation report was required. Although a probation report is often advisable where a defendant is ineligible for probation, it was within the trial court's discretion whether to order one. [Citations.] Murray does not show on appeal how the trial court abused that discretion, and we therefore hold that no error occurred." (*Id.* at p. 289, fn. omitted.)

Although Cerda argues his rights were violated because there could have been mistakes in the probation report, he acknowledges a probation report was subsequently prepared and filed, and as the Attorney General notes, he points to no mistakes in that report. Cerda has failed to demonstrate error here.

11. *Sentencing error: Johnson.*

Johnson was found guilty of second degree murder and 23 counts of premeditated attempted murder, for which the trial court imposed a sentence of 410 years to life. Because this sentence violated the Eighth Amendment, we agree with Johnson that his case should be remanded to the trial court for resentencing.

Johnson was 16 years old at the time of the shootings. The United States Supreme Court has, in recent years, expressed concern about sentencing juvenile offenders to prison terms that prevent any possibility of rehabilitation and eventual release. In *Roper v. Simmons* (2005) 543 U.S. 551 [125 S.Ct. 1183], the court held that juveniles must be treated differently than adults when it comes to sentencing. "*Roper* established that

46

because juveniles have lessened culpability they are less deserving of the most severe punishments. [Citation.] As compared to adults, juveniles have a ' "lack of maturity and an underdeveloped sense of responsibility" '; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.' [Citation.] These salient characteristics mean that '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citation.] Accordingly, 'juvenile offenders cannot with reliability be classified among the worst offenders.'. . . [¶] No recent data provide reason to reconsider the Court's observations in *Roper* about the nature of juveniles. As petitioner's *amici* point out, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. . . . Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults." (*Graham v. Florida* (2010) 130 S.Ct. 2011, 2026 [176 L.Ed.2d 825].

*Roper* held the imposition of capital punishment on juvenile offenders for any offense whatsoever violated the Eighth Amendment. *Graham* held the imposition of a life-without-possibility-of-parole sentence on a juvenile offender for a non-homicide offense violated the Eighth Amendment. *Miller v. Alabama* (2012) 132 S.Ct. 2455, 2469 [183 L.Ed.2d 407], held "the Eighth Amendment forbids a sentencing scheme that *mandates* life in prison without possibility of parole for juvenile offenders" who commit homicide, although a trial court could in its discretion impose such a punishment. (Italics added.)

In *People v. Caballero* (2012) 55 Cal.4th 262, our Supreme Court concluded that, under the reasoning of these United States Supreme Court cases, "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." (*Id.* at p. 268.) *Caballero* reasoned: "*Miller . . . made it clear that Graham's 'flat ban' on life without parole sentences*

47

*applies to all nonhomicide cases involving juvenile offenders, including the term-of-years sentence that amounts to the functional equivalent of a life without parole sentence* imposed in this case. [¶] Defendant in the present matter will become parole eligible over 100 years from now. [Citation.] Consequently, he would have no opportunity to 'demonstrate growth and maturity' to try to secure his release, in contravention of *Graham*'s dictate. [Citations.] *Graham*'s analysis does not focus on the precise sentence meted out. Instead . . . it holds that a state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime. [Citation.]" (*Id.* at pp. 267-268, fn. omitted.)

Johnson was sentenced on August 26, 2011, before either *Miller* (decided June 25, 2012) or *Caballero* (decided August 16, 2012) was handed down. The trial court's explanation for imposing the functional equivalent of a life-without-possibility-of-parole term on Johnson was limited to the following: "In imposing consecutive sentences, the court has considered that the crimes were of a very violent nature, including an AK-47 weapon that was sprayed into a home that was occupied by at least 15 people which resulted in the murder of one person. [¶] And then the defendant went to a second location, which was separate and distinct from the first location, where he and his confederates also [fired] multiple rounds into the home of gang rivals. And that home was occupied, again, by numerous people, including babies, infants and children, as well as adults."

The only apparent reference to Johnson's juvenile status came after pronouncing sentence, when the trial court said: "You know, sentencing a young man to state prison for probably the rest of his life is not an easy thing to do, especially when I look at your mother, who is torn apart because of your actions. [¶] You've got to think of other people, Mr. Johnson. Not just yourself. [¶] And what a terrible, terrible decision you made. I bet you look back at it and just wish you could change time, but you can't."

Given these circumstances, we believe the proper course is to vacate Johnson's sentence and remand to the trial court for resentencing in accordance with the new case law from the United States Supreme Court and the California Supreme Court. (See

48

*People v. Thomas* (2012) 211 Cal.App.4th 987, 1013-1015 [juvenile defendant's sentence of 196 years to life, for special circumstances murder and attempted murder, reversed and remanded for resentencing because it predated *Miller* and *Caballero*]; *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1480-1482 [juvenile defendant's minimum aggregate sentence of 100 years, for murder and multiple attempted murders, reversed and remanded for resentencing because it predated *Miller* and *Caballero*].)[11]

We express no opinion as to how the trial court should weigh the factors discussed in *Miller* and *Caballero,* or as to how long Johnson's sentence should be.

---

[11]      In response to *Miller*, *Graham*, and *Caballero*, the Legislature recently enacted section 3051, which includes provisions for a parole suitability hearing after a maximum of 25 years for most juvenile offenders serving life sentences. The question whether these provisions are sufficient to comply with the mandate of *Miller*, *Graham*, and *Caballero* is currently pending before the California Supreme Court in *In re Alatriste* (review granted Feb. 19, 2014, S214652) and *In re Bonilla* (review granted Feb. 19, 2014, S214960).

49

## DISPOSITION

The judgments are affirmed in part, reversed in part, and remanded with directions. Johnson's sentence is vacated and the matter remanded to the trial court for resentencing in light of the Eighth Amendment and the *Miller* and *Caballero* cases, and consistent with this opinion. In all other respects, the judgment as to Johnson is affirmed. Cerda's first degree murder conviction is reversed and the matter is remanded to the trial court. The People may accept a reduction of this conviction to second degree murder. If, after the filing of the remittitur in the trial court, Cerda is not retried within the time described in section 1382, subdivision (a)(2), the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction of second degree murder and shall resentence Cerda accordingly.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:


KLEIN, J.[*]


KITCHING, J.


_____

[*] Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.